**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3740-23

JESSICA HOFFER KAYLOR,

      Plaintiff-Respondent,

v.

TERESA BACALLAO, EMPIRE
MANAGEMENT GROUP, LLC,
and TERESA SANCHEZ,

      Defendants-Appellants.

_____

Argued September 18, 2025 – Decided October 9, 2025

Before Judges Mawla, Marczyk, and Bishop-Thompson.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-1481-20.

Dana Wefer (Law Offices of Dana Wefer, LLC) argued the cause for appellants.

John V. Salierno argued the cause for respondent (Law Offices of Peter W. Till, attorneys; John V. Salierno, on the brief).

PER CURIAM

This case requires us to interpret Hoboken's Rent Control Ordinance[1] (Ordinance) to determine whether a backyard falls under the Ordinance's definitions of "dwelling," "housing space," or "service," or whether the yard can be rented separately. Defendants Teresa Bacallao, Empire Management Group, LLC (Empire), and Teresa Sanchez appeal from several orders entered against them and in favor of plaintiff Jessica Hoffer Kaylor. Following our review of the record and the applicable legal principles, we conclude the subject yard is not governed by the Ordinance and, therefore, we reverse.

I.

Bacallao was the owner of a four-unit residential building located in Hoboken. In addition to the four apartments, the property also has a private backyard. Defendants Bacallao and Sanchez, in a joint certification, asserted:

> To enter the backyard, one must enter the building from an exterior sidewalk. One must enter a door located under an exterior staircase using a key. (This is NOT the door for the entrance of the building.) One enters the basement vestibule. Then one . . . walk[s] to another door requiring a key; then one . . . walk[s] down a hallway and must go through a third door requiring a key in order to enter the backyard.

---

[1] Hoboken, N.J., Code § 155.

Bacallao and Empire furnished and maintained the yard, including a storage shed, fencing, furniture, and a grill.

Empire is a property management company owned by its sole member, Sanchez, who is Bacallao's daughter. Empire was responsible for managing the rental premises, including the yard and the building. Defendants certified that, prior to renting the apartment to plaintiff, Sanchez consulted Hoboken's then rent regulation officer, who advised her the yard was not regulated by the Ordinance. Sanchez also certified she witnessed Hoboken's current rent regulation officer tell Bacallao's attorney the Ordinance did not apply to outdoor spaces. Bacallao offered apartment tenants use of the backyard under a separate yard lease agreement drafted by Sanchez.

In July 2015, plaintiff entered into an apartment lease for one of the building's four units for $1,259.48 per month. On the same day, plaintiff also entered into a separate yard lease for $590.52 per month.[2] Between July 2015 and June 2019, when plaintiff's leases ended, she paid $27,951.28 as rent under the yard lease alone. On their annual registration statements filed with Hoboken

_____

[2] The record does not contain the actual apartment lease or yard lease between defendants and plaintiff. However, the parties agree the exemplar leases provided to the trial court for the other tenants contain the same provisions as the lease entered into between plaintiff and defendants.

A-3740-23

pursuant to the Ordinance, defendants listed the rent charged for the apartments in the building, but not the rent charged for the yard.

The yard lease has a provision titled "[a]dditional [r]ent," which states in full:

> If the tenant fails to comply with any agreement in this lease, the landlord may do so on behalf of the tenant. The landlord may charge the cost to comply with the tenant as "additional rent." This includes reasonable attorney's fees incurred by the landlord as a result of the tenant's violation of any lease agreement. The additional rent shall be due and payable as rent with the next monthly rent payment. Nonpayment of additional rent gives the landlord the same rights against the tenant as if the tenant failed to pay rent.

Moreover, the "[e]nd of [t]erm" section of the yard lease provides, "[t]his agreement will be considered terminated if the tenant lawfully terminates/vacates their apartment tenancy."

Plaintiff filed her complaint in April 2020, alleging breach of contract, common law fraud, equitable fraud, and violations of the Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -210. Defendants Empire and Sanchez, and defendant Bacallao, at the time represented by separate counsel, answered the complaint in September 2020. Bacallao subsequently moved to dismiss plaintiff's

4

complaint, which the trial court denied in December 2020.[3] In October 2021, Sanchez and Empire moved to dismiss, and Bacallao separately moved for summary judgment. The trial court denied both motions on December 20, 2021, and wrote an accompanying statement of reasons.[4]

The initial judge noted defendants' assertion—that they spoke to the former rent regulation officer and were informed the yard was excluded from the Ordinance—was not "reduced to writing" and found the record was "devoid of any admissible, reliable, non-hearsay evidence to corroborate this representation." She also rejected Bacallao's argument plaintiff was required to get a legal rent calculation from the Hoboken Rent Control Board (Board) as a condition precedent to filing her action. She distinguished Glynn v. Park Tower Apartments, 213 N.J. Super. 357 (App. Div. 1986), finding:

> In Glynn, the plaintiffs' action sought a judgment awarding a rebate of invalid rent increases to [the] plaintiff tenants. Here, [p]laintiff's action is for breach of contract, including a breach of the covenant of good faith and fair dealing by charging to and collecting from [p]laintiff rent for the backyard that . . . Sanchez did not report or disclose on the registration statements, and also common law fraud, in that [d]efendants misrepresented to [p]laintiff that the backyard could be

_____

[3] That order is not being appealed.

[4] The judge who entered the December 20, 2021 order was not the same judge who entered the subsequent orders.

rented separately from the apartment and that rent for the backyard could be charged to and collected . . . separately from and in addition to the rent for the apartment. Additionally, the . . . Ordinance does not include an exclusive administrative remedy—or any remedy at all for that matter—for any alleged violation of a regulation under the [O]rdinance. . . . [Thus,] [p]laintiff was [not] obligated to file a complaint with the [Board] before filing this action in court.

The judge went on to address defendants' argument the yard did not fit within the Ordinance's definition of "dwelling" or "housing space." She agreed with plaintiff that "a genuine issue of material fact exist[ed] regarding whether [d]efendants were permitted to lease the backyard separately from the apartment." Moreover, the judge noted she had not been "presented with irrefutable evidence or binding legal authority demonstrating that backyard spaces are exempt from the . . . Ordinance's purview."

Over two years later, in March 2024, plaintiff moved for summary judgment on her breach of contract and CFA claims. Empire and Sanchez cross-moved for summary judgment, which Bacallao joined.

On May 10, 2024, a second judge granted plaintiff's motion for summary judgment, awarded treble damages against defendants for violation of the CFA, and granted plaintiff's motion as to her breach of contract claim. The judge wrote an accompanying statement of reasons, finding the "issue" was whether

defendants violated the Ordinance "by entering into a separate agreement with [plaintiff] for additional charges" for the yard. She found "[t]he landlord offered tenants the use of the yard by charging 'additional rent.' The [y]ard [l]ease . . . has a provision on page [two] outlined as 'additional rent.'" The judge found:

> The relevant portion here is, "[t]he addition[al] rent shall be due and payable as rent with the next monthly rent payment." It also gives the landlord the same rights against the tenant as if the tenant failed to pay rent. One of those rights, is the right to pursue an eviction. The purpose of the . . . [O]rdinance is to protect tenants from evictions that violate the [O]rdinance. Since this provision clearly identifies the yard lease payment as additional rent, the [c]ourt concludes that [d]efendants are subject to the . . . [O]rdinance, they violated that [O]rdinance, and . . . [d]efendants are subject to the [CFA].

The judge further determined plaintiff "established that [d]efendants' violation of the . . . [O]rdinance by charging additional rent for housing space [wa]s unlawful conduct under the . . . [CFA] and caused [p]laintiff an ascertainable loss in the overpayment of $27,951.23 in illegal yard rent to Empire," and thus granted plaintiff's motion for summary judgment. She also denied defendants' cross-motions for summary judgment for the same reasons expressed in granting plaintiff's motion for summary judgment.

Empire and Sanchez subsequently moved for reconsideration regarding the denial of their cross-motion for summary judgment. On July 22, 2024, the

7

judge denied the motion, noting it was "clear" the "[a]dditional [r]ent" provision of the yard lease "identifies the yard lease payment as additional rent."

## II.

On appeal, defendants contend the trial court erred because there is no unlawful act to support a CFA claim, as any alleged rental overcharge cannot be established without a legal rent calculation for the yard, and yards are not regulated by the Ordinance. They maintain the summary judgment entered in favor of plaintiff was improper because it relied upon a factual issue not alleged by plaintiff, which defendants were not given an opportunity to dispute. Defendants next assert the award conflicts with the Ordinance's statute of repose. They also contend expansion of the Ordinance to include yards raises important public policy and constitutional issues. Further, defendants argue summary judgment should not have been granted on the breach of contract claim, as plaintiff failed to allege any facts that amount to a breach.

This court reviews the disposition of a summary judgment motion de novo, applying the same standard used by the motion judge. Townsend v. Pierre, 221 N.J. 36, 59 (2015). We view "the competent evidential materials presented, . . . in the light most favorable to the non-moving party, [and determine whether they] are sufficient to permit a rational factfinder to resolve the alleged disputed

issue in favor of the non-moving party." Town of Kearny v. Brandt, 214 N.J. 76, 91 (2013) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)); see also R. 4:46-2(c). "Where the record taken as a whole could not lead a rational trier of fact to find for the non[-]moving party, there is no 'genuine issue for trial.'" Alfano v. Schaud, 429 N.J. Super. 469, 474-75 (App. Div. 2013) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

An order denying reconsideration under Rule 4:49-2 is reviewed for abuse of discretion. Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021). "The rule applies when the court's decision represents a clear abuse of discretion based on plainly incorrect reasoning or failure to consider evidence or a good reason for the court to reconsider new information." Pressler & Verniero, Current N.J. Court Rules, cmt. 2 on R. 4:49-2 (2026).

We owe no deference to a motion judge's interpretation of ordinances and review a judge's order interpreting such ordinances de novo. See Bubis v. Kassin, 184 N.J. 612, 627 (2005) ("As with other legislative provisions, the meaning of an ordinance's language is a question of law that we review de novo."). Similarly, we review a trial court's interpretation of a contract de novo. Serico v. Rothberg, 234 N.J. 168, 178 (2018).

"The established rules of statutory construction govern the interpretation of a municipal ordinance." Twp. of Pennsauken v. Schad, 160 N.J. 156, 170 (1999). Therefore, courts interpret an ordinance to "effectuate the legislative intent in light of the language used and the objects sought to be achieved." Ibid. (quoting Merin v. Maglaki, 126 N.J. 430, 435 (1992)). First, courts examine the ordinance's language. Ibid. If it is clear and unambiguous, a plain reading of the ordinance governs. Ibid. If it is susceptible to at least two different interpretations, the court must look at extrinsic evidence such as its purpose, legislative history, and the overall statutory scheme. Ibid. "Above all, the [c]ourt must seek to effectuate the 'fundamental purpose for which the legislation was enacted.'" Ibid. (quoting N.J. Builders, Owners & Managers Ass'n v. Blair, 60 N.J. 330, 338 (1972)).

We begin by examining Hoboken's Ordinance governing rent control. The Ordinance requires a rent regulation officer to make determinations about rent under the Ordinance. Section 155-3 states:

> Establishment of rents between landlord and tenant in housing space in dwellings to which [the Ordinance] is applicable shall . . . be determined by the provisions of [the Ordinance]. Any rental increase at a time other than at the expiration of a lease or termination of the periodic lease shall be void. Any rental increase in excess of that authorized by the . . . [Ordinance] shall

be void. Determinations under this section shall be made by the [r]ent [r]egulation [o]fficer.

Section 155-1 contains the following definitions:

DWELLING[:] Any building or structure or trailer or land used as a trailer park, rented or offered for rent to one or more tenants or family units.

. . . .

HOUSING SPACE[:] Includes that portion of a dwelling rented or offered for rent for living and dwelling purposes, with all privileges, services, furnishings, furniture, equipment, facilities and improvements connected with the use or occupancy of such portion of the real property.

. . . .

RENT[:] Any price for the use of a housing space. It includes any charge, no matter how set forth, paid by the tenant for the use of any service in connection with the housing space. Security deposits and charges for accessories, such as boats, mobile homes and automobiles not used in connection with the housing space, shall not be construed as "rent."

. . . .

SERVICE[:] The provision of light, heat, hot water, maintenance, painting, elevator service, air conditioning, storm windows, screens, superintendent service and any other benefit, privilege or facility connected with the use or occupancy of any dwelling or housing space.

Section 155-4 states, "[a]ll rents for rental of housing space and services in dwellings to which [the Ordinance] is applicable are . . . controlled at the base rent level . . . and no rental increases shall be . . . demanded, paid[,] or accepted, except as provided in" the Ordinance.

Defendants assert the subject yard is excluded from the Ordinance because it is not a "dwelling," cannot be a "portion of a dwelling," and thus cannot be considered "housing space." They contend, "[b]ecause yards are not housing spaces in dwellings, they are not regulated by the [Ordinance]," and thus, the court erred in not dismissing the CFA claims. They argue the first judge erred in finding an issue of material fact regarding whether defendants could lease the yard separately from the apartment, because that is a question of law involving an interpretation of the Ordinance.

Defendants further argue the yard cannot be considered a privilege, facility, benefit, or service connected with the use or occupancy of a housing space because it is neither part of the dwelling nor associated with the use or occupancy of the housing space. They contend the "housing space is a portion of a dwelling and includes the physical space and the services connected with the use or occupancy of the living portion of the dwelling. The [O]rdinance's examples of such services are all physical features of a living space that concern

access and habitability . . . ." Defendants assert the yard is a separately accessed space and could be offered to tenants without affecting the apartment's housing space. They further contend the judge improperly shifted the burden of proof onto them to prove they were allowed to rent the yard. They assert it is plaintiff's burden to prove the yard lease was unlawful.

Initially, we reach a different conclusion than the first judge, who held there were issues of material fact that precluded the court from ruling on defendants' summary judgment motion. The motion required an analysis of the Ordinance and not a resolution of disputed facts. We also part company from the second judge, who granted plaintiff's summary judgment motion and denied defendants' cross-motion, based on the "additional rent" provision in the yard lease. Plaintiff never asserted this provision was implicated under the facts presented. Moreover, the additional rent provision of the yard lease deals with situations where a tenant fails to comply with provisions of the yard lease and allows the landlord to charge costs to the tenant—including reasonable attorney fees—incurred as a result of the breach. This litigation did not involve plaintiff's breach of the lease.

Turning to the Ordinance, we observe its language is not a model of clarity in the context of a separate yard lease. The definitions section does not directly

13

address whether a backyard is subject to the Ordinance's rent control provisions. Therefore, we must examine whether the subject yard is encompassed in any of the relevant definitions set forth in the Ordinance. We conclude a backyard does not fall within the Ordinance's scope.

The Ordinance regulating plaintiff's leases defines "dwelling" as encompassing only "building[s] or structure[s]." A dwelling also consists of a "trailer or land used as a trailer park," but that is not applicable here because the property upon which the apartment is located is not a trailer park. However, the Ordinance's reference to "land used as a trailer park" demonstrates Hoboken intended, in limited circumstances, to include land within the definition of "dwelling."

Notably, the Ordinance does not include the term "land" or "yard" when defining "dwelling" with respect to a structure or building. That is, Hoboken did not include the land on which a building or structure was situated as part of the "dwelling." Hoboken arguably could have drafted the Ordinance to include a backyard, but did not do so. For example, Section 155-2(H) states the Ordinance does not apply to newly constructed multiple dwellings as defined in N.J.S.A. 2A:42-84.1. That statute defines a "multiple dwelling" as "any building or structure and <u>land appurtenant thereto</u> containing four or more dwelling units

14

. . . ." Ibid. (emphasis added). In drafting its Ordinance, Hoboken did not utilize the language "land appurtenant thereto" or "grounds" when addressing buildings in its definition of dwelling under the Ordinance.

The definition of "housing space" in the Ordinance includes "that portion of a dwelling . . . offered for rent for . . . dwelling purposes, with all privileges, services, furnishings, furniture, equipment, facilities[,] and improvements connected with the use . . . of such portion of the real property." The phrase "that portion of a dwelling" necessarily refers only to a "building or structure," as those terms are discussed under "dwelling." Also, the yard is not a privilege or facility "connected with the use . . . of such portion of the real property." We interpret the subsequent reference to "such portion" of the property as referring back to the initial phrase, which again pertains solely to the building or structure. The Ordinance specifically enumerates items such as "furnishings" and "furniture" as components of housing space, yet omits any reference to something as significant as a yard. We are, therefore, unpersuaded that a yard is a facility or privilege for the purposes of the Ordinance. Hoboken could have readily included yards within the definition of "housing space," but again, did not draft the Ordinance in that manner.

We likewise do not believe a yard is included in the definition of "service" in the Ordinance. The items set forth in the definition of "service" also make no reference to a yard. The definition specifically references "[t]he provision of light, heat, hot water, maintenance, painting, elevator service, air conditioning, storm windows, screens, [and] superintendent service[s]." The services definition also includes "any other benefit, privilege[,] or facility connected with the use or occupancy of [the] dwelling or housing space." We are unconvinced we can infer this definition includes a yard, given the context of the other specific services referenced. It would seem unusual for the Ordinance to mention minor items, such as a window screen as a "service," but not something as important as a backyard, and assume the public would understand that a yard was encapsulated in the remaining language of the definition.

At oral argument, plaintiff acknowledged defendants could have chosen to not allow her use of the backyard at all. However, plaintiff argued if access to the yard was granted, then separate rent could not be charged for the yard. We are unpersuaded.

There is no clear language in the Ordinance that demonstrates Hoboken was seeking to regulate yards as part of its rent control scheme. Aside from our interpretation of the Ordinance, this was not a situation where plaintiff expected

16

to have access to the yard as part of the apartment lease given she had been advised prior to entering into the lease that access to the yard would require a separate agreement. There is also no indication in the record the yard had been included as part of the apartment lease in the past. Plaintiff was not compelled to agree to the separate yard lease, and non-payment of the rent under the yard lease would not result in eviction from the apartment. Additionally, access to the yard was not required for plaintiff to fully utilize and enjoy the apartment, unlike several other specifically designated services included in the Ordinance, like heat and hot water.

The Ordinance makes no specific reference to any ancillary outdoor space—such as a yard, detached garage, or storage shed—in its definition of "dwelling," "housing space," or "service." The yard here is analogous to a detached garage or exterior storage shed that could be rented to an unrelated business. It was treated as a separate amenity under both leases. Hoboken could have drafted the Ordinance to clarify any ambiguity regarding yards. However, as written, the Ordinance does not fairly put the landlord on notice that a yard is a "dwelling," "housing space," or "service."

In Central Towers Company v. Fort Lee, relied upon by plaintiff, the court interpreted Fort Lee's Rent Control Ordinance (the Fort Lee Ordinance), which

17

included definitions of "dwelling" and "housing space," which were similar to the definitions in Hoboken's Ordinance. 160 N.J. Super. 546, 550 (Law Div. 1978), aff'd o.b. sub nom., Inganamort v. Rent Leveling Bd., 173 N.J. Super. 457 (App. Div. 1980). There, the plaintiffs were owners of multiple high-rise apartment complexes that did not "automatically carry with it a space for an automobile," but the tenants could sign a separate lease for a parking space. Id. at 547-48. Importantly, "the policy of the Rent Leveling Board ha[d] been to include outdoor or indoor garage parking space[s] as within the purview of the rent leveling ordinance."[5] Id. at 548-49.

The plaintiffs argued the Fort Lee Ordinance did not apply to the garage or parking spaces because "garage space" or "parking space" did not appear in the definition of "housing space" and were granted under separate leases. Id. at 550. The court found the argument ignored the "reality of contemporary suburban life" because cars are "a necessity and not a luxury in the suburbs." Ibid. The court further noted the parking spaces were "usually rented" to tenants under agreements and were not "excluded from the apartment leases either in those leases or through a general understanding between the landlords and

---

[5] Hoboken has not adopted such a policy regarding the inclusion of backyards in its Ordinance.

tenants." Id. at 552-53. It deemed such parking spaces "a privilege, service[,] or facility connected with the use or occupancy of the demised property." Id. at 553.

Central Towers is distinguishable because there is no indication Hoboken's "policy" was to treat yards as within the purview of the Ordinance. Moreover, a yard is different from a car (and the need for a parking space) insofar as a yard can be viewed as more of a luxury than a necessity integral to the use of an apartment. Furthermore, defendants specifically excluded the yard from the apartment lease, and there is no indication the yard was customarily rented to the tenants at the subject property.

We are mindful of the remedial nature of Hoboken's Rent Control Ordinance and plaintiff's argument defendants are attempting to circumvent the Ordinance. However, a sensible reading of the Ordinance leads us to conclude Hoboken did not intend to include yards as within its scope.

Finally, because we determine the yard lease did not violate the Ordinance, we need not address defendants' remaining arguments.

Reversed. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

19